## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

**DEMETRIUS FRAZIER,**

      **Plaintiff,**

    **v.**                      **No. _____**

**JOHN Q. HAMM, Commissioner,**    **CAPITAL CASE**
**Alabama Department of Corrections,**

**and**                         **Execution Warrant Requested**

**TERRY RAYBON, Warden,**
**Holman Correctional Facility,**

      **Defendants.**

_____

## COMPLAINT
_____

1. Demetrius Frazier (Plaintiff) is in the custody of the Alabama Department of Corrections (ADOC) and Defendants Hamm and Raybon at William C. Holman Correctional Facility (Holman) under sentence of death.[1]

2. Plaintiff brings this action, pursuant to 42 U.S.C. § 1983, alleging Defendants have deprived, or will deprive, him of rights and privileges secured by the Constitution and laws of the United States.

---

[1] On October 18, 2024, Defendant Marshall moved the Alabama Supreme Court to issue a warrant authorizing Governor Kay Ivey to set an execution time frame for Mr. Frazier. Mr. Frazier has until November 25, 2024, to respond.

## JURISDICTION AND VENUE

3. This is an action for declaratory and injunctive relief.

4. This Court has jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 2201, and 2202.

5. Venue is appropriate in the Middle District of Alabama under 28 U.S.C. § 1391(b).

## PARTIES

6. Demetrius Frazier, a citizen of the United States and physically present in Alabama, is subject to execution by the State of Alabama pursuant to a state court judgment of conviction for capital murder.

7. John Q. Hamm, in his official capacity, is the Commissioner of the ADOC.

8. Terry Raybon, in his official capacity, is the Warden of Holman and Petitioner's statutory executioner.

## CASE OR CONTROVERSY

9. There is a real and justiciable case or controversy between the parties.[2]

## ADMINISTRATIVE EXHAUSTION

10. Plaintiff has no available administrative remedies, as "[t]he policies and procedures of the Department of Corrections for execution of persons sentenced to

---

[2] This case does not challenge Mr. Frazier's conviction and sentence.

death shall be exempt from the Alabama Administrative Procedure Act, Chapter 22 of Title 41."[3]

## FACTUAL ALLEGATIONS

11. Mr. Frazier has asthma.

12. Mr. Frazier is subject to execution by nitrogen hypoxia.

13. Alabama Attorney General Steven Marshall (General Marshall) and his staff wrote the nitrogen execution protocol (Protocol).

14. The Protocol uses a mask to deliver 99.9999% pure nitrogen gas.

15. If both EKGs required under the Protocol fail, the execution will continue.

16. If both pulse oximeters required under the Protocol fail, the execution will continue.

17. The Protocol does not provide for use of a sedative.

18. Defendant Hamm adopted the Protocol.

19. Defendant Raybon implements the Protocol.

20. Defendant Raybon oversees the execution team.

21. Kenneth Eugene Smith (Mr. Smith) was the first person in history to be executed by nitrogen hypoxia.

---

[3] Ala. Code § 15-18-82.1(g); *see also In re Alabama Lethal Injection Protocol*, 12-cv-00316-WKW (M.D. Ala. 2012), Doc. 354 at 5 (admitting "[n]o administrative grievance process is available for Plaintiffs or other death row inmates to challenge the procedures to be employed during their executions.").

22. On January 25, 2024, Mr. Smith died after being subjected to the Protocol by Defendants Hamm and Raybon.

23. At Mr. Smith's execution, ADOC Captain Brandon McKenzie (Captain McKenzie) oversaw the execution team.

24. Prior to Mr. Smith's death, Defendants Hamm and Raybon—through their counsel, General Marshall—represented to this Court the Protocol would "cause unconsciousness within seconds" of nitrogen flowing into the mask.[4]

25. Defendants Hamm and Raybon knew, or should have known, increased levels of oxygen in the nitrogen execution system would cause the execution to last significantly longer than "seconds."

26. Defendants Hamm and Raybon did not follow the manufacturer's instructions to "fit" the mask specifically to Mr. Smith or test the fit of the mask on Mr. Smith.

27. Many witnesses were present for Mr. Smith's execution, including Mike Sennett (Mr. Sennett), one of victim Elizabeth Sennett's sons.

28. Mr. Sennett witnessed the 2010 lethal injection execution of Mr. Smith's co-defendant, John Parker, and the 2023 failed attempt to execute Mr. Smith by lethal injection.

---

[4] Defs.' Post-Hr'g Br. in Opp'n to Pl. Smith's Mot. for Prelim. Inj., *Smith v. Hamm, et al.*, No. 2:23-cv-656-RAH (M.D. Ala. Dec. 29, 2023), ECF Doc. 66 at 12.

29. Mr. Parker was executed with a three-drug protocol that began with a five-grams of sodium thiopental, followed by a paralytic and then potassium chloride.

30. Mr. Sennett described Mr. Parker's execution as "like him going to sleep."[5]

31. "[A] person designated by the [ADOC] to participate in an execution in any capacity shall be exempt from criminal liability for necessary actions taken to carry out the execution."[6]

32. "[A] person authorized by state law to prepare, compound, or dispense medication and designated by the [ADOC] may prepare, compound, or dispense a lethal injection."[7]

33. ADOC obtains midazolam for use in lethal injection executions from "a person authorized by state law to prepare, compound, or dispense medication."

34. Other witnesses to Mr. Smith's nitrogen execution included Mr. Smith's wife (now widow), Deanna Smith, son, Steven Tiggleman, longtime attorney Robert Grass, and independent journalist Lee Hedgepeth of Tread.

---

[5] Nicholas Bogel-Burroughs, *A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw*, N.Y. Times, Feb. 1, 2024, https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

[6] Ala. Code § 15-18.82.1(f).

[7] *Id.*

35. Five statutory[8] media witnesses were present: (1) Kim Chandler of the Associated Press; (2) Ralph Chapoco of the Alabama Reflector; (3) Ivana Hrynkiw of AL.com; (4) Lauren Layton of News 19 (WHNT); and (5) Marty Roney of the Montgomery Advertiser.

36. At Mr. Smith's execution, Captain McKenzie was responsible for conducting the Protocol's consciousness check.

37. According to Captain McKenzie, Mr. Smith remained conscious for several minutes after the nitrogen began flowing into his mask.

38. After the nitrogen began flowing, and while he was still conscious, Mr. Smith writhed and struggled against the restraints for several minutes.

39. After the nitrogen began flowing, and while he was still conscious, Mr. Smith gasped for air for several minutes.

40. Mr. Smith's responses after the nitrogen began flowing showed the signs of terror and pain associated with conscious suffocation.

41. Mr. Smith's autopsy results establish he suffered from negative pressure pulmonary edema (NPPE).

---

[8] *See* Ala. Code § 15-18-83(a)(6); ADOC Execution Procedures XI(A)(vii)(2) (Aug. 2023) ("News media representatives who were unable to witness the execution will be provided an opportunity to ask questions of the news media representatives who attended the judicial execution as statutory witnesses.").

42. NPPE occurs when a person attempts to breathe while the upper airway is obstructed, causing fluid to be drawn from blood vessels into the alveoli.

43. An individual experiencing panic and sensing an inability to breathe while also being denied oxygen will experience a constricted airway like an upper airway obstruction. This creates the NPPE observed in Mr. Smith's autopsy findings.

44. Mr. Smith was conscious for several minutes after he was deprived of all oxygen.

45. Mr. Sennett said Mr. Smith looked like "a fish out of water for some time[.]"[9]

46. Mr. Sennett explained, "We were told by some people that worked [in the prison system] that he'd take two or three breaths and he'd be out and gone. That ain't what happened. After about two or three breaths, that's when the struggling started."[10]

47. After he described "all that struggling and jerking and trying to get off that table," Mr. Sennett said a nitrogen hypoxia execution is "just something I don't ever want to see again."[11]

---

[9] Bogel-Burroughs, "A Select Few," *supra*.

[10] *Id.*

[11] *Id.*

48. Defendants Hamm and Raybon executed Alan Eugene Miller (Mr. Miller) using the Protocol on September 26, 2024.

49. At Mr. Miller's execution, Captain McKenzie oversaw the execution team.

50. Captain McKenzie did not determine Mr. Miller was unconscious until approximately six minutes after the nitrogen began flowing.

51. Mr. Miller remained conscious for several minutes after the nitrogen began flowing into his mask.

52. After the nitrogen began flowing, and while he was still conscious, Mr. Miller writhed and struggled against the restraints for several minutes.

53. After the nitrogen began flowing, and while he was still conscious, Mr. Miller gasped for air for several minutes.

54. Mr. Miller's responses after the nitrogen began flowing showed the signs of conscious suffocation.

55. Mr. Miller's autopsy has not been released yet.

56. Regardless of whether Mr. Miller suffered from NPPE, he was conscious for several minutes after he was deprived of all oxygen.

57. The Protocol does not provide for what to do in the event a prisoner is still conscious "within seconds" of nitrogen beginning to flow into the mask.

8

58. Defendants Hamm and Raybon have made no changes to the Protocol to account for continued consciousness observed in Messrs. Smith and Miller during their executions.

59. Defendants' representation that Mr. Smith's execution was "textbook," Mr. Miller's went as expected, and nitrogen hypoxia has worked in theory and practice—even though it has, in both instances, resulted in conscious suffocation lasting several minutes with visible signs of terror and pain—demonstrates Defendants intend this result.

60. Defendants' failure to modify the Protocol following the executions of Messrs. Smith and Miller shows it is designed to inflict superadded terror or pain.

61. Midazolam is a controlled substance.

62. ADOC obtains midazolam for executions from a pharmacist or pharmacy.

63. ADOC possesses, and can obtain, midazolam for use in executions.

64. Ketamine, a short-term anesthetic, is a controlled substance.

65. Ketamine is readily available in pharmacies throughout Alabama.

66. Fentanyl, an analgesic, and sedative is a controlled substance.

67. The estimated lethal dose of fentanyl for a human being is 2 mg.

68. Fentanyl is readily available in pharmacies throughout Alabama.

69. Fentanyl is no longer subject to patent.

70. Ketamine is no longer subject to patent.

71. A pharmacist has the training and skill to synthesize ketamine from readily available, non-controlled materials.

72. A chemist can synthesize ketamine from readily available, non-controlled materials.

73. A pharmacist has the training and skill to synthesize fentanyl from readily available, non-controlled materials.

74. A chemistry student can synthesize fentanyl from readily available, non-controlled materials.

75. The mask used in the Protocol is designed and intended to help workers breathe in oxygen-deficient environments or environments containing harmful gases or substances.

76. The mask is neither designed for, nor intended to, deliver nitrogen gas for purposes of causing death.

77. The manufacturer of the mask requires it be fitted and tested on the intended user prior to use.

78. Only Defendant Hamm has the authority to alter, amend, or make exceptions to the Protocol and procedures governing the execution of death-sentenced prisoners in the State of Alabama.

79. Defendant Hamm is responsible for implementing the Protocol.

80. Defendant Raybon, as statutory executioner, is responsible for ensuring the Protocol is carried out in the manner intended.

81. At the time the nitrogen hypoxia statute was enacted, binding Eleventh Circuit precedent prohibited prisoners from challenging lethal injection with any method other than one authorized by law.[12]

82. Thus, on the effective date of the nitrogen hypoxia statute, anyone who wished to challenge execution by lethal injection had one option: elect nitrogen hypoxia.

83. A heavily redacted copy of the Protocol[13] was released in late August 2023.

84. Defendants used the Protocol to execute Mr. Smith on January 25, 2024.

85. Defendants used the Protocol to execute Mr. Miller on September 26, 2024.

86. Plaintiff became subject to nitrogen hypoxia in June 2018, over five years before the Protocol was developed and made public.

87. There is a substantial likelihood the Protocol, as employed in the "textbook" execution of Mr. Smith and the execution of Mr. Miller, will cause Mr.

---

[12] *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1317 (11th Cir. 2016) (holding, generally, that an alternative method must be statutorily authorized), *abrogation recognized by Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201, 1207 (11th Cir. 2020).

[13] All references to the Protocol refer to the redacted protocol made public in August 2023.

Frazier to be deprived of oxygen while he remains conscious until he dies, and to experience suffocation.[14]

88. Depriving a conscious person of oxygen creates a "constitutionally unacceptable risk of suffocation."[15]

89. Because the Protocol does not have sufficient safeguards to prevent conscious suffocation, it violates the Eighth Amendment.

90. According to anesthesiologist Joseph Antognini, M.D., "a person given 500 milligrams of midazolam" intravenously "would be rendered completely unconscious and insensate to pain and [noxious] stimuli," "lack of breathing . . . can be a noxious stimul[us] if you're conscious," and in three drug protocols using a paralytic, "the first drug, midazolam, is intended to prevent that feeling from occurring[.]"

91. To satisfy the Eighth Amendment's pleading requirement announced in *Glossip v. Gross*, 576 U.S. 863 (2015), Mr. Frazier must provide an alternative that is feasible and reduces the risk of an Eighth Amendment violation.

92. Any alternative must be "sufficiently detailed" to show it can be "readily implemented."

---

[14] *Suffocation,* Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/suffocation.

[15] *Baze v. Rees*, 553 U.S. 35, 53 (2008).

93. The Eighth Amendment's alternative method requirement, as announced in *Glossip*, is a religiously neutral law of general applicability.

94. Mr. Frazier is a devout and practicing Muslim and has been for decades.

95. Mr. Frazier has a sincerely held religious belief that committing suicide or assisting in a suicide is forbidden.

96. Mr. Frazier sincerely believes that providing an alternative method of execution is the equivalent of assisting a suicide.

97. Enforcing the Eighth Amendment requirement that Mr. Frazier plead an alternative method substantially burdens Mr. Frazier's sincerely held religious beliefs.

98. Without waiving the foregoing, *counsel for Mr. Frazier* offers two readily available and feasible alternatives to the Protocol. The first is an alternative nitrogen execution protocol. The second is a sequential, intramuscular injection of ketamine and a fatal dose of fentanyl.

**Method one: Alternative nitrogen gas protocol.**

99. On the day of the execution, the prisoner will be escorted into the chamber.

100. The IV team shall set IV lines consistent with lethal injection executions.

101. The prisoner shall then be allowed to make a final statement.

102. Before and after the final statement, the prisoner shall be allowed to be ministered to by his or her spiritual advisor, according to the previously approved plan.

103. Following the final statement, the prisoner will receive an intravenous injection of 500 mg of midazolam.[16]

104. Five minutes after administration of the midazolam is complete, a member of the execution team will conduct a consciousness check identical to the consciousness check employed in ADOC's lethal injection protocol.[17]

105. As with the lethal injection protocol, in the unlikely event the prisoner is still conscious after the first dose of midazolam, a second, identical dose will be administered, followed by a five-minute wait and another consciousness check. If the prisoner remains conscious after a second consciousness check, the execution will be postponed for a full medical assessment and determination of what, if anything, went wrong.

106. If Defendant Raybon, or his designee, is satisfied the prisoner is unconscious, the designated execution team member(s) will place the mask securely

---

[16] The preparation and administration of the dose should follow the ADOC's protocol for injecting midazolam during a lethal injection.

[17] That check consists of calling out the prisoner's name loudly three times. If no response is observed, the execution team member brushes the eyelid of the prisoner. If no response is observed, the execution team member performs a trapezius pinch. If no response is observed, the prisoner is deemed unconscious.

on the prisoner. Once the mask is secure, the execution will proceed as provided in the Protocol. The execution team should observe the EKG monitor. Once the monitor indicates the prisoner is dead, the leads should be verified as working correctly.

107. At that time, the nitrogen flow should be turned off. After a 60 second wait, the mask can be removed, and the prisoner can be removed from the facility.

**Method Two: Sequential, intramuscular injection of ketamine and fentanyl.**

108. This alternative calls for the use of a sequential, intramuscular injection of ketamine and fentanyl.

109. The prisoner will be placed on the gurney in the execution chamber in full sight of all witnesses.

110. The prisoner's spiritual advisor, if any, will minister to the prisoner based on the previously approved spiritual advisor plan.

111. The prisoner will speak his final words, if desired.

112. EKG leads will be connected to the prisoner and an EKG machine will remain in sight of the witnesses. The EKG will be monitored throughout the process.

113. Designated personnel will perform an intramuscular injection of ketamine in a 4 mg/kg weight dose.

114. After 10 minutes, designated personnel will perform an intramuscular injection of 2 mg of fentanyl.

115. In the unlikely event the initial dose of fentanyl has not resulted in death after 10 minutes, a second identical dose will be given.

116. Once the EKG indicates the prisoner is dead, the leads should be verified as working correctly.

## CLAIMS FOR RELIEF

117. Plaintiff asserts two claims for injunctive and declaratory relief.

## CLAIM ONE

**The Protocol violates Mr. Frazier's Eighth Amendment right to be free from cruel and unusual punishment because it does not ensure he will be unconscious when deprived of oxygen and does not contain safeguards to prevent survivable hypoxia induced injury.**

118. Plaintiff incorporates paragraphs 1 through 116 in support of Claim One.

119. The Eighth Amendment guarantees every person the right to be free from cruel and unusual punishment.

120. Conscious suffocation violates the Eighth Amendment's prohibition on cruel and unusual punishment because it superadds terror and pain.

121. A method of execution violates the Eighth Amendment if "the risk of pain associated with the State's method is substantial when compared to a known and available alternative."[18]

---

[18] *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019) (citations and internal quotation marks omitted).

122. The Protocol creates a substantial risk of unconstitutional terror and pain during an execution.

123. If the flow of nitrogen were to stop while Mr. Frazier is still alive, it could result in permanent brain damage from oxygen deprivation.

124. The Protocol fails to prevent the almost certain risk of terror and pain associated with conscious deprivation of oxygen.

125. First, there is no provision for pre-nitrogen sedation.

126. Conscious suffocation during an execution violates the Eighth Amendment.[19]

127. Plaintiff's feasible and available alternative for inducing fatal nitrogen hypoxia significantly lowers the almost certain risk of terror and pain associated with the conscious deprivation of oxygen under the Protocol.

128. Plaintiff's feasible and available alternative protocol for execution by sequential intramuscular injection of ketamine and fentanyl significantly lowers the almost certain risk of terror and pain associated with the conscious deprivation of oxygen under the Protocol.

129. Sedation prior to induction of hypoxia would eliminate the terror and pain resulting from being deprived of oxygen while conscious.

---

[19] *Baze*, 553 U.S. at 53.

130. Providing a sedative prior to the hypoxia process will also decrease the possibility of breath holding.[20]

131. Second, the Protocol does not require the mask to be properly fitted to Plaintiff.

132. An improperly fitted mask will allow oxygen to enter Plaintiff's system, making the process last longer and increasing the terror and pain of suffocation.

133. The Protocol does not account for residual oxygen in the tubing and other parts of the nitrogen execution system.

134. This residual oxygen must be accounted for in determining how long it would take for nitrogen induced hypoxia to work.

135. As Defendants' expert testified in *Smith*, the more oxygen in the system the longer it takes to induce hypoxia.

136. Alone, or in combination with an ill-fitting mask, this excess oxygen in the system significantly increases the risk of a torturous execution in violation of the Eighth Amendment.

---

[20] While Plaintiff does not concede Mr. Smith voluntarily held his breath during his execution, it would not be possible for him to have held his breath long enough to affect the process. What the witnesses saw were the effects of conscious suffocation. In fact, the best explanation for what occurred during the Smith Execution is that the Protocol rendered Mr. Smith involuntarily unable to breath properly due to upper airway constriction.

137. Thus, Plaintiff has established a valid Eighth Amendment claim, requiring an order prohibiting his execution under the Protocol and requiring his execution under one of his alternatives.

## CLAIM TWO

**The Protocol violates Mr. Frazier's Eighth Amendment rights because it creates a substantial risk of hypoxia induced injury by failing to provide for a pre-execution physical to check for upper airway obstructions, ADOC employees who check and maintain the equipment are not adequately trained, and ADOC does not train their employees sufficiently to use the mask to kill a prisoner humanely.**

138. Plaintiff incorporates paragraphs 1 through 137 in support of Claim Two.

139. Inadequate delivery of nitrogen has a high risk of causing hypoxia induced brain injury without resulting in death.

140. Causing such injury and leaving Plaintiff alive violates the Eighth Amendment.

141. Numerous aspects of the Protocol increase the risk of hypoxia induced injury, leaving the prisoner brain damaged, but not dead.

142. Individuals with upper airway obstruction issues, including asthma, will not breathe as effectively as individuals without these issues. This will cause the process to be delayed in a way that violates the Eighth Amendment. A medical examination prior to execution would identify such issues and permit development of specific modifications to the process.

19

143. The Protocol includes an arbitrary time-based criterion requiring nitrogen be given to Plaintiff through a mask for 15 minutes or until five minutes after Plaintiff shows a flat line on an EKG, whichever is longer.

144. The medical definition of death is not based on the duration of a hypoxic insult. There is no factual or medical basis for picking 15 minutes in this instance.

145. The Protocol requires Plaintiff be monitored with a pulse oximeter and an EKG.

146. While the Protocol requires those items are checked prior to the execution, it does not indicate the training levels, if any, of the persons responsible.

147. The Protocol does not provide for monitoring the accuracy of this equipment as the execution progresses.

148. Pulse oximeters may become dislodged during the process and create false readings indicating Plaintiff is dead when he is still alive.

149. EKG machines also have artifacts that could provide false readings during the execution.

150. A false reading could occur if one of the EKG leads becomes loose during the execution.

151. Although the Protocol calls for the use of two EKG machines and two pulse oximeters, if both of either fail, the execution proceeds.

152. Because of the Protocol's maximum time to administer nitrogen, equipment errors could lead to stopping the flow of nitrogen while Plaintiff is still alive but has sustained permanent brain injury.

153. The failure of the Protocol to provide safeguards related to the essential equipment monitoring Plaintiff's vital signs creates a substantial risk of him surviving with a hypoxia induced brain injury.

## PRAYER FOR RELIEF

For the above reasons, Plaintiff respectfully requests this Court:

1) Issue an order declaring the Protocol unconstitutional and enjoining Defendants Hamm and Raybon from executing Mr. Frazier using the Protocol;

2) Issue an order prohibiting Defendants Hamm, and Raybon from executing Mr. Grayson using any method other than one of the alternatives provided by his attorneys; and

3) Grant such other relief as this Court finds proper and just.

/s/John Anthony Palombi
John Anthony Palombi
John_Palombi@fd.org

/s/Spencer J. Hahn
Spencer J. Hahn
Spencer_Hahn@fd.org

/s/Eric Brown
Eric Brown
Eric_Brown@fd.org

/s/Matt D. Schulz
Matt D. Schulz
Matt_Schulz@fd.org

Federal Defenders for the
Middle District of Alabama
817 S. Court Street
Montgomery, Alabama 36104
(334) 834-2099