IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DEMETRIUS FRAZIER,                          )
                                            )
        Plaintiff,                          )
                                            )
        v.                                  )        CASE NO. 2:24-cv-732-ECM
                                            )               [WO]
JOHN Q. HAMM, Commissioner,                 )
Alabama Department of Corrections, *et al.*, )
                                            )
        Defendants.                         )

## MEMORANDUM OPINION and ORDER

## I.  INTRODUCTION

Demetrius Frazier is scheduled to be executed by nitrogen hypoxia between 12:00 a.m. on February 6, 2025, and 6:00 a.m. on February 7, 2025, almost thirty years after he was sentenced to death for the capital murder of Pauline Brown.  On November 15, 2024, Frazier filed this 42 U.S.C. § 1983 action against John Q. Hamm ("Commissioner Hamm"), Commissioner of the Alabama Department of Corrections ("ADOC"); and Terry Raybon ("Warden Raybon"), Warden of Holman Correctional Facility ("Holman"), where the execution is set to occur (collectively, "the State" or "Defendants"), in their official capacities.  As relevant here, Frazier claims that executing him using the ADOC's current nitrogen hypoxia protocol ("Protocol") will violate his rights under the Eighth Amendment to the United States Constitution based on allegations that the Protocol creates unconstitutional risks of psychological pain.  Frazier seeks declaratory and injunctive relief.

Three weeks and one day before his execution date, Frazier moved this Court for a preliminary injunction, in which he seeks to enjoin the State from executing him using any method other than his proposed alternative, or until this litigation can be resolved on the merits. (Doc. 22 at 2–3).[1]  The State opposes the motion.

The Court held an evidentiary hearing and oral argument on the motion on January 28, 2025.  Upon careful consideration of the parties' arguments, evidence presented, relevant caselaw, and for the reasons below, the Court concludes that Frazier's motion for a preliminary injunction (doc. 22) is due to be denied.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  PROCEDURAL HISTORY AND BACKGROUND[2]

### A.    Frazier's Capital Litigation History

Early in the morning of November 26, 1991, Frazier broke into Pauline Brown's Birmingham apartment by entering through a window. *Frazier v. Bouchard*, 661 F.3d 519,

---

[1] References to page numbers are to those generated by the Court's CM/ECF electronic filing system.

[2] "When ruling on a preliminary injunction, 'all of the well-pleaded allegations [in a movant's] complaint . . . are taken as true.'" *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1063 (M.D. Ala. 2021) (first alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)).  Moreover, "[t]he [C]ourt may also consider supplemental evidence, even hearsay evidence, submitted by the parties." *Id.* (citing *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)).  In addition to the factual allegations in Frazier's complaint, the Court also considered the evidence presented at the January 28, 2025 evidentiary hearing, in Frazier's motion for preliminary injunction (doc. 22), and in the State' response to Frazier's motion (doc. 31).  With that said, the facts recited here are not exhaustive of the facts presented in the parties' filings, evidentiary submissions, or the evidentiary hearing; rather, the Court presents the facts which it finds relevant in ruling on Frazier's motion.

522 n.1 (11th Cir. 2011) (quoting *Ex parte Frazier*, 758 So. 2d 611, 613 (Ala. 1999)). Frazier, armed with a .22 caliber pistol, discovered Brown asleep in one of the bedrooms, woke her, and demanded money. *Id.* After Brown gave Frazier money from her purse, he raped her at gunpoint. *Id.* During the rape, Brown begged Frazier not to kill her, and when she would not stop begging for her life, Frazier shot her in the back of the head. *Id.* He then left the apartment to see if anyone had heard the gunshot, and satisfied that no one had, he returned to Brown's apartment to look for more money and confirm that she was dead. *Id.*

In March 1992, while in police custody in Michigan on an unrelated charge, Frazier confessed to murdering Brown. *Ex parte Frazier*, 758 So. 2d at 612–13. A Jefferson County, Alabama grand jury indicted Frazier on three counts of capital murder for Brown's killing. Count I charged him with murder during the course of a robbery, *see* ALA. CODE § 13A–5–40(a)(2); Count II charged him with murder during the course of a burglary, *see id.* § 13A–5–40(a)(4); and Count III charged him with murder during the course of a rape, *see id.* § 13A–5–40(a)(3). *Ex parte Frazier*, 758 So. 2d at 613. In 1996, a jury convicted Frazier on Count I (murder during a robbery) and recommended a sentence of death by a 10–2 vote. *Frazier*, 661 F.3d at 522.[3] The trial court followed the jury's recommendation and sentenced Frazier to death. *Frazier*, 661 F.3d at 522.

---

[3] As to Count III (murder during a rape), the jury found Frazier guilty of the lesser-included offense of intentional murder. *Ex parte Frazier*, 758 So. 2d at 613. The jury was unable to reach a verdict on Count II (murder during a burglary), and the trial court declared a mistrial on that count. *Id.*

Frazier appealed to the Alabama Court of Criminal Appeals ("ACCA"), and the ACCA affirmed his conviction and death sentence as to Count I. *Frazier v. State*, 758 So. 2d 577, 610 (Ala. Crim. App. 1999). Frazier then sought review in the Alabama Supreme Court, which affirmed his conviction and death sentence on December 30, 1999. *Ex parte Frazier*, 758 So. 2d at 616–17. The United States Supreme Court denied Frazier's petition for a writ of certiorari on October 2, 2000. *Frazier v. Alabama*, 531 U.S. 843 (2000) (Mem).

Frazier then sought collateral review in state court. On September 26, 2001, Frazier timely filed a petition pursuant to Alabama Rule of Criminal Procedure 32, which was denied without an evidentiary hearing by the Jefferson County Circuit Court ("Rule 32 Court"). *Frazier v. State*, 884 So. 2d 908, 909 (Ala. Crim. App. 2003). After the ACCA reversed and remanded with instructions, the Rule 32 Court again denied Frazier's Rule 32 petition without an evidentiary hearing, which the ACCA affirmed. *Frazier*, 661 F.3d at 523 & n.4. The Alabama Supreme Court denied certiorari review. *Id.* at 523.

Having exhausted state remedies, Frazier next sought relief in federal court. To that end, he petitioned for habeas relief pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Alabama. *Id.* The district court denied Frazier's § 2254 petition on September 28, 2007. *See id.* The Eleventh Circuit Court of Appeals granted a certificate of appealability but ultimately affirmed the denial of habeas relief. *Id.* at 523, 534. The United States Supreme Court denied certiorari on October 1, 2012. *Frazier v. Thomas*, 568 U.S. 833 (2012) (Mem).

On October 21, 2013, Frazier filed a § 1983 action in this Court alleging that the State's lethal injection protocol—to which he was subject at the time—was

unconstitutional. (*See* doc. 1 in *Frazier v. Myers et al.*, Case No. 2:13-cv-781-WKW (M.D. Ala.)).   In November 2015, his case was consolidated with those of other condemned inmates challenging the State's lethal injection protocol. (Doc. 59 in *In Re: Alabama Lethal Injection Protocol Litigation*, Case No. 2:12-cv-316-WKW (M.D. Ala. Nov. 5, 2015) ("*Lethal Injection Protocol Litigation*")).   The condemned inmates challenged numerous aspects of the State's lethal injection protocol as violating the First, Eighth, and Fourteenth Amendments. (Doc. 348 in *Lethal Injection Protocol Litigation*).   As to their Eighth Amendment claim, the condemned inmates took specific issue with the three-drug cocktail's use of midazolam as an anesthetic or sedative. (*Id.* at 9–10, paras. 35–42).   As one of their four preferred methods of execution, the condemned inmates pled "asphyxiation via the inhalation of pure nitrogen gas," which they claimed would render "the condemned inmate unconscious within seconds and painlessly dead within minutes." (*Id.* at 32–33, paras. 161–63).   Their proposal also called for "the administration of an anxiolytic, such as midazolam,"[4] prior to the introduction of nitrogen gas. (*Id.* at 33, para. 163).   While the litigation was pending, the State approved nitrogen hypoxia as a new method of execution. (*See* doc. 427 at 1–2, para. 2 in *Lethal Injection Protocol Litigation*). In June 2018, the condemned inmates were given the option to have their death sentences carried out via nitrogen hypoxia rather than lethal injection.   The condemned inmates,

---

[4] An anxiolytic is an anti-anxiety medication. *Anxiolytic*, NCI Dictionary of Cancer Terms, NAT'L CANCER INSTITUTE https://www.cancer.gov/publications/dictionaries/cancer-terms/def/anxiolytic (last visited Jan. 30, 2025).

including Frazier, elected execution by nitrogen hypoxia, and in July 2018, their case was dismissed as moot (doc. 429 in *Lethal Injection Protocol Litigation*).

On October 18, 2024, Alabama Attorney General Steve Marshall moved the Alabama Supreme Court to authorize Frazier's execution by nitrogen hypoxia. (Doc. 22-1). On November 15, 2024, twenty-eight days later, Frazier filed this action. (Doc. 1). On November 25, 2024, Frazier filed a response in the Alabama Supreme Court requesting that the court hold the motion to authorize his execution in abeyance pending the final resolution of his lawsuit in this Court challenging the Protocol. Notwithstanding Frazier's opposition, on December 16, 2024, the Alabama Supreme Court authorized Frazier's execution by nitrogen hypoxia (doc. 22-2), and on January 7, 2025, Alabama Governor Kay Ivey ("Governor Ivey") set Frazier's execution timeframe for 12:00 a.m. on Thursday, February 6, 2025, through 6:00 a.m. on Friday, February 7, 2025 (doc. 22-3). Frazier filed his motion for preliminary injunction in this Court on January 15, 2025 (doc. 22), but only after prompting by the Court (doc. 19).

**B.    Nitrogen Hypoxia in Alabama**

For years, condemned inmates, including Frazier, challenged the State's lethal injection protocol and proposed nitrogen hypoxia as their preferred feasible and readily implemented alternative method of execution. *See, e.g.*, *Smith v. Hamm*, 2023 WL 4353143, at *5 (M.D. Ala. July 5, 2023); *Miller v. Hamm*, 640 F. Supp. 3d 1220, 1244 (M.D. Ala. 2022); *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1326–28 (11th Cir. 2019) (per curiam). On March 22, 2018, Governor Ivey signed a bill amending Alabama Code § 15-18-82.1 to add nitrogen hypoxia as an approved method of execution in

Alabama. (*See* doc. 427 at 1–2, para. 2 in *Lethal Injection Protocol Litigation*).  Under the amended statute, which took effect on June 1, 2018, lethal injection remains Alabama's primary method of execution. ALA. CODE § 15-18-82.1(a).  However, condemned inmates are now afforded one opportunity to elect execution by nitrogen hypoxia instead. *Id.* § 15-18-82.1(b).  Inmates like Frazier, whose death sentences became final prior to the amended statute taking effect, had thirty days to make their election. *Id.* § 15-18-82.1(b)(2).  At some point prior to the July 2, 2018 deadline,[5] Frazier officially elected execution by nitrogen hypoxia. (Doc. 22-4).

The Protocol was not finalized until August 2023—over five years after Frazier and several other condemned inmates elected execution by nitrogen hypoxia.  The public version of the Protocol, the only version to which condemned inmates have access, consists of over forty pages, many of which contain redactions.  As a brief summary, the Protocol calls for the following:  (1) the condemned inmate is led to the execution chamber and placed on the gurney, at which time members of the execution team secure onto him a pulse oximeter; (2) an industrial-use respirator mask is placed and adjusted on the condemned inmate's face; and (3) after a series of safety checks, the reading of the execution warrant, and any final words from the condemned inmate, pure nitrogen gas is introduced into the

---

[5] Alabama law states that the "[t]ime within which any act is provided by law to be done must be computed by excluding the first day and including the last.  However, if the last day is Sunday, . . . the last day also must be excluded, and the next succeeding secular or working day shall be counted as the last day within which the act may be done." ALA. CODE § 1-1-4.  Excluding June 1, 2018, the day the statutory period began to run, thirty days is through July 1, 2018.  July 1, 2018, was a Sunday and thus cannot be counted as the last day.  Therefore, under Alabama rules of construction, the statutory period to elect nitrogen hypoxia ran from June 1, 2018, through July 2, 2018.

mask and administered for the longer of fifteen minutes or five minutes following a flatline

indication on the EKG. (Doc. 22-5 at 17–19).[6]  Frazier would be the fourth inmate executed

under the Protocol he challenges.

## C.    The Present Action

Frazier filed this action on November 15, 2024. (*See* doc. 1).  And now, over a year

after the Protocol was released, one month after the Alabama Supreme Court authorized

his execution, and less than one month before his execution begins, Frazier asks this Court

to enjoin the State from executing him using any method other than his current proposed

alternative, a modified nitrogen hypoxia protocol in which he receives a pre-nitrogen

sedative such as midazolam.  In the alternative, Frazier asks the Court to enjoin the State

from executing him until this case can be decided on the merits.

Frazier's complaint asserts two Eighth Amendment claims pursuant to § 1983.  In

Count I, he claims that Alabama's current nitrogen hypoxia protocol poses a substantial

risk of terror and pain associated with the deprivation of oxygen while he is still conscious,

which he calls conscious suffocation. (Doc. 1 at 16–19, paras. 116–37).  In Count II, Frazier

asserts that the Protocol creates a substantial risk of hypoxia-induced brain injury because

it does not require a pre-execution medical examination; does not ensure that the mask fits

properly; and does not include safeguards related to the essential equipment monitoring his

vital signs, including the pulse oximeters and EKG machines. (*Id.* at 19–21, paras. 138–

---

[6] The Protocol does not specify when the EKG leads are placed onto the inmate or who places the leads. Cynthia Stewart-Riley, a regional director for the ADOC, previously testified that the leads are placed on the inmate by Emergency Medical Technicians (EMTs). (Doc. 44-3 at 65–66).

53). Frazier's complaint proposes two alternative execution methods: (1) a nitrogen gas protocol which includes prior sedation of the inmate using 500 mg of midazolam; and (2) a sequential, intramuscular injection of ketamine, followed by a fatal dose of fentanyl.

On January 28, 2025, the Court held an evidentiary hearing and oral argument on Frazier's motion for a preliminary injunction. At the hearing, Frazier's counsel clarified that Frazier seeks preliminary injunctive relief based on the allegations regarding pre-nitrogen sedation and not regarding mask fit or hypoxia-induced brain injury. Additionally, Frazier's counsel represented that Frazier is not relying on the second proposed alternative method of execution (ketamine/fentanyl) for purposes of the motion for a preliminary injunction. Consequently, this Opinion focuses on Frazier's claim that the Protocol's failure to provide for pre-nitrogen sedation violates the Eighth Amendment.

The Court heard testimony from three witnesses at the evidentiary hearing: Dr. Brian McAlary ("Dr. McAlary"); Dr. Joseph Antognini ("Dr. Antognini"), the State's medical expert; and Commissioner Hamm. The Court also admitted numerous exhibits offered by Frazier and the State. (*See* doc. 44). Finally, at the parties' request, the Court took judicial notice of certain testimony and exhibits which were presented in litigation brought by Carey Grayson ("Grayson"), a former death row inmate who made a similar challenge to the Protocol and was executed on November 21, 2024. (*See* doc. 39 at 1); (*see also Grayson v. Hamm et al.*, 2:24-cv-376-RAH (M.D. Ala. 2024)).[7] The Court

---

[7] In Grayson's litigation challenging the Protocol, Dr. McAlary was offered and accepted as an expert for Grayson. To the extent the parties requested that the Court take judicial notice of Dr. McAlary's expert testimony in the Grayson litigation, the Court has considered that testimony. At the evidentiary hearing in Frazier's case, however, Dr. McAlary testified only as a lay witness.

has reviewed and considered all of the parties' evidence. The Court summarizes some of the relevant evidence and testimony later in this section.

Frazier claims that the Protocol "creates an unacceptable risk of superadded pain because it achieves hypoxia through conscious suffocation." (Doc. 22 at 14). According to Frazier, the Protocol creates an unconstitutional risk of conscious suffocation because it contains "no provision for pre-nitrogen sedation," which "fails to prevent the almost certain risk of terror and pain associated with conscious deprivation of oxygen." (Doc. 1 at 17, paras. 124–25). Frazier acknowledges that the pain at issue is psychological pain rather than physical pain. He also alleges that his proposed alternative method of execution, which calls for "an intravenous injection of 500 mg of midazolam" before nitrogen gas begins flowing into the mask, will substantially alleviate the psychological pain he would otherwise face. (*Id.* at 14, para. 103).

In support of his assertions, Frazier cites studies and Dr. McAlary's testimony. Frazier also offers allegations and testimony regarding the nitrogen hypoxia executions of Kenneth Smith ("Smith"), Alan Miller ("Miller"), and Grayson. Frazier asserts that these three nitrogen hypoxia executions prove that "Alabama's method does not work the way Defendants claim and necessarily causes conscious suffocation, in violation of the Eighth Amendment." (Doc. 22 at 2).[8] The Court describes each of these executions below.

---

[8] As discussed further below, the State claims that the Protocol causes "unconsciousness within seconds" of nitrogen flowing into the mask. (Doc. 1 at 4, para. 24). At the evidentiary hearing, Frazier's counsel stated that they do not know why the Protocol is not working as the State claims, only that, according to Frazier, "[s]omething's going wrong." (Doc. 45 at 90:3–11).

*Kenneth Smith*

On January 25, 2024, the State executed Smith pursuant to the Protocol, making him the first person in the world to be executed by nitrogen hypoxia. (Doc. 22 at 4).  Media witnesses to the execution reported that, after the nitrogen gas began flowing and for a period of several minutes, Smith made numerous movements on the gurney, gasping for air and struggling against the restraints. (Doc. 1 at 6, paras. 38–39; doc. 44-8 at 2; doc. 44-9 at 2; doc. 44-13 at 4).  Brandon McKenzie ("Captain McKenzie"), who was the execution team captain, suggested that Smith remained conscious for several minutes after the nitrogen gas was introduced. (Doc. 1 at 6, para. 37; doc. 44-4 at 20).  Frazier asserts that "Smith was conscious for several minutes after he was deprived of all oxygen" (doc. 1 at 7, para. 44), and that "Smith's responses after the nitrogen began flowing showed the signs of terror and pain associated with conscious suffocation" (*id.* at 6, para. 40).

The State counters that "media observers did not know when the nitrogen gas began to flow, so they cannot say how long [Smith] appeared to be conscious" and that, even if they did know when the gas began to flow, they "cannot reliably pinpoint when an inmate loses consciousness." (Doc. 31 at 16–17).  The State further contends that "Smith held his breath, delaying the time to unconsciousness" (*id.* at 17), and that once Smith took a "deep inhale and exhale . . . he lost consciousness shortly thereafter" (doc. 44-25 at 3, para. 5). In support of this assertion, the State cites "Smith's pulse oximetry (showing high oxygen levels inconsistent with someone breathing nitrogen, followed by a sudden drop); the observations of ADOC Regional Director Cynthia Stewart-Riley; the [declaration and

testimony] of Dr. Antognini[9]; a statement from Smith's expert[10]; and Smith's combative and dishonest behavior (resisting the officers and claiming he could 'smell' the nitrogen)." (Doc. 31 at 17) (parentheticals in original).[11]

### *Alan Miller*

On September 26, 2024, the State executed Miller using the Protocol. "According to media witnesses, Miller remained conscious for several minutes after the nitrogen began flowing during which he writhed and struggled against the restraints and gasped for air." (Doc. 22 at 5–6; *see also* doc. 44-7 at 2; doc. 44-12 at 3; doc. 44-14 at 2). Commissioner Hamm previously testified that what the witnesses saw was "agonal breathing,"[12] which is a "natural part of the dying process." (Doc. 44-3 at 51, 53). Captain McKenzie, who was

---

[9] Dr. Antognini's declaration reads as follows: "The affidavit of Brandon McKenzie provides important eye-witness information. Mr. McKenzie states that [Smith] 'did not scream, cry, moan[,] or say anything to indicate he was in any pain.' He observed that Smith tensed up, and raised his body up off the gurney, followed by exhalation (with production of saliva that went onto the face mask). Subsequently, the oxygen saturation decreased from 97–98% to the low 40s and then to 17%, all in the matter of 45-60 seconds. He further observed that Smith did not have any additional movements. Although Mr. McKenzie was not specifically looking for any breath holding efforts by Smith, his observations would be consistent with Smith holding his breath. Any movement during the period when the oxygen saturation was 97–98% would have been voluntary. The rapid decrease in oxygen saturation from 97–98% to 17% after Smith appeared to forcefully exhale and then inhale is consistent with a person inhaling nearly 100% nitrogen." (Doc. 31-1 at 19, para. 30).

[10] Dr. Philip Nitschke, Smith's medical expert, wrote after Smith's execution that "[t]he convulsions [Smith] experienced were almost certainly accentuated by his obvious (and understandable) non-cooperation with the execution process." (Doc. 31-1 at 20, para. 31) (parenthetical in original). He further wrote that "breath-holding would have increased the level of carbon dioxide in [Smith's] body, acidifying his blood and increasing discomfort and distress." (*Id.*). "By the time of the convulsions," however, "[Smith] would not have been aware of what was happening to him." (*Id.*).

[11] Nitrogen is a colorless, odorless gas. (Doc. 31-5 at 2).

[12] Agonal breathing is defined as "[a]n abnormal breathing pattern originating from lower brainstem neurons and characterized by labored breaths, gasping, and, often, [muscle jerks] and grunting." *Agonal Respiration*, NAT'L LIBRARY OF MEDICINE, https://www.ncbi.nlm.nih.gov/medgen/746160 (last visited Jan. 29, 2025).

once again the execution team captain, noted that Miller's pulse oximeter reading "trickled down methodically from 98% to around 45%" in the first "minute and a few seconds" of the execution. (Doc. 44-4 at 26).  Six minutes into the execution, Captain McKenzie approached and examined Miller.  By that point, Miller was a "grayish color," his chest was not rising, and his eyes were "open" and "focused directly toward the ceiling." (*Id.* at 27).  Frazier asserts that Miller's "responses after the nitrogen began flowing showed signs of conscious suffocation." (Doc. 22 at 6).  Like with Smith, the State casts doubt on the media witnesses' ability to know when the nitrogen gas began flowing or when Miller lost consciousness.   Additionally, the State submits that "the idea that [Miller] remained conscious for as long as 'six minutes' while breathing pure nitrogen gas is preposterous," based on Dr. Antognini's cited studies which show loss of consciousness occurring in a matter of seconds, not minutes. (Doc. 31 at 17).

### *Carey Grayson*[13]

On November 21, 2024, the State executed Grayson using the Protocol.  One media witness described the moment "nitrogen began flowing" as follows:  "Grayson tightly clenched his hands, took deep gasps, shook his head vigorously[,] and pulled against his restraints.  He appeared to lose consciousness . . . about six minutes" after the introduction of nitrogen gas. (Doc. 22 at 6).  Dr. McAlary witnessed Grayson's execution and testified as a lay witness regarding his observations thereof.  Dr. McAlary testified that upon what

---

[13] Grayson's execution occurred about a week after Frazier filed this lawsuit.  Besides what appears to be an inadvertent mention of Grayson in Frazier's prayer for relief (doc. 1 at 21), Frazier's complaint does not mention Grayson.  But Frazier does discuss Grayson's execution in his motion for a preliminary injunction and offered evidence about it at the evidentiary hearing. (*See* doc. 22 at 6).

he believed to be the introduction of nitrogen gas, Grayson appeared distressed and agitated. (Doc. 45 at 13:13–19, 15:6–9).[14]  He described Grayson as shaking his head, rapidly moving his eyes, and struggling against the restraints as his depth and rate of breathing increased. (Doc. 45 at 15:10–17).  Then, at what Dr. McAlary estimated to be three minutes after the introduction of nitrogen gas, Grayson slowly raised his legs in tandem, paused for a few seconds, and then slowly lowered his legs back to the supine position. (*Id.* at 15:18–25; 16:1–2, 23–25; 17:1–3).  Dr. McAlary noted that after Grayson lowered his legs, he continued to breathe at an increased depth and rate for approximately two more minutes, before his breaths slowed down and became shallower for the next ten minutes. (*Id.* at 17:4–8).  Dr. McAlary stated that after those ten minutes, all movement ended, and shortly after that, Grayson's "voluntary efforts at respiration ceased." (*Id.* at 17:9–13).

The State asserts that there is no evidence that Grayson was conscious when he moved on the gurney.  Citing multiple studies, Dr. Antognini testified at the evidentiary hearing that it is not unusual for an individual experiencing hypoxia to have involuntary movements or suffer convulsions upon becoming unconscious, at which point the individual can no longer feel pain. (*E.g.*, doc. 45 at 35:21–25, 36:1–8).  He said that even synchronous movements, like Grayson lifting his legs in tandem, can occur involuntarily when an individual is unconscious, and that synchronicity has no bearing on whether a movement was voluntary or involuntary. (*Id.* at 41:24–25, 42:1–13).   At bottom,

---

[14] Grayson testified in his deposition that he was "probably not" going to cooperate in the carrying out of his execution. (Doc. 44-75 at 18:12–14).

Dr. Antognini stood by his opinion that the Protocol should render an inmate unconscious within seconds of the introduction of pure nitrogen gas. (*Id.* at 62:4–10).

After Frazier filed his complaint, the State filed a motion to dismiss (doc. 14), which is fully briefed and remains pending.  The matter presently before the Court is Frazier's motion for a preliminary injunction. (Doc. 22).

## IV.  LEGAL STANDARD

To be entitled to a preliminary injunction, Frazier must demonstrate:  (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to him outweighs the harm the injunction would cause the other litigants; and (4) that the injunction would not be adverse to the public interest. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam).  Where, as here, "the [State] is the party opposing the preliminary injunction, its interest and harm merge with the public interest," and thus the third and fourth elements are the same. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Such relief is "'not to be granted unless the movant clearly established the "burden of persuasion"' for each prong of the analysis." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (citation omitted).  As the movant, Frazier must satisfy his burden on all four elements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  Failure to meet any of the elements "is fatal" to the request for injunctive relief.

*Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir. 2024) (citation omitted), *cert. denied sub nom. Grayson v. Hamm*, 2024 WL 4846625 (U.S. Nov. 21, 2024).

## V. DISCUSSION

Although Frazier's complaint asserts two Counts, he represented at the evidentiary hearing that he is pursuing a preliminary injunction only as to the allegations in Count I regarding pre-nitrogen sedation.  As relevant here, Frazier claims in Count I that the State's Protocol poses a substantial risk of terror and psychological pain associated with the deprivation of oxygen while he is still conscious, which he calls conscious suffocation. (Doc. 1 at 16–19, paras. 118–37).  For purposes of the motion for a preliminary injunction, Frazier's counsel[15] proposes the following alternative method of execution:  a nitrogen gas protocol which includes prior sedation of the inmate using an intravenous injection of 500 mg of midazolam.

---

[15] The State argues, without citation to relevant authority or much analysis, that Frazier was required to personally plead proposed alternative methods of execution, and because Frazier's *lawyers* pleaded the alternatives, Frazier is unlikely to succeed on the merits of his Eighth Amendment claim.  The Court finds this argument unavailing because Frazier is bound by the "acts and omissions" of his lawyers, and his lawyers did plead alternatives on Frazier's behalf due to Frazier's sincerely held religious beliefs (doc. 1 at 13, paras. 93–98). *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397 (1993) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962)); *Link*, 370 U.S. at 633–34 (explaining that attorneys, especially in civil litigation, are "freely selected agent[s]," and allowing a plaintiff to "avoid the consequences of the acts or omissions of this freely selected agent . . . would be wholly inconsistent with our system of representative litigation"); *Young v. City of Palm Bay*, 358 F.3d 859, 864 (11th Cir. 2004) (explaining that in "our system of representative litigation, . . . each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts" (quoting *Pioneer Inv. Servs. Co.*, 507 U.S. at 396–97)).  For simplicity, the Court will reference Frazier's counsel's proposed alternative method of execution as Frazier's proposed alternative.

The State opposes Frazier's request for injunctive relief, arguing that Frazier is not entitled to a preliminary injunction because he is unlikely to succeed on the merits and because the equities weigh against the entry of a preliminary injunction. (Doc. 31).

The Court concludes that Frazier has not established entitlement to a preliminary injunction for two independent reasons.  First, Frazier has failed to show a substantial likelihood of success on the merits—"the most important preliminary-injunction criterion." *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127–28 (11th Cir. 2022); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) (per curiam) ("Controlling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion.").  Second, the balance of the equities militates strongly against granting injunctive relief because Frazier inexcusably delayed filing this action and even more inexcusably delayed seeking injunctive relief.  For these reasons, Frazier has not shown he is entitled to the extraordinary remedy of a preliminary injunction.[16]

---

[16] Frazier also suggests he can prevail under an alternative formulation of the preliminary injunction standard (doc. 22 at 12 & n.51), which requires showing a "substantial case on the merits" and that the equities weigh heavily in favor of granting injunctive relief. *See Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (per curiam)) (discussing this test in the context of a motion for stay pending appeal); *see also Ruiz*, 650 F.2d at 565 (explaining that "the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay").  But this case bears little resemblance to the cases where a stay has been granted under this standard, including because a stay or injunction here would disrupt rather than preserve the status quo. *See, e.g.*, *Ruiz*, 650 F.2d 555 (granting, in part, a stay pending appeal to preserve the status quo where the district court's injunction "impose[d] sweeping and exacting changes upon the State's prison system and its operation").  Frazier has not demonstrated entitlement to relief under this alternative standard because, for the reasons explained later in this Opinion, he has not shown that the equities weigh heavily in favor of an injunction or stay.

The Court first explains why Frazier has not established a substantial likelihood of success on the merits. Then, the Court addresses Frazier's dilatory conduct and explains how the equities do not favor preliminary injunctive relief.

## A.    Substantial Likelihood of Success on the Merits

The United States Constitution unquestionably permits the State of Alabama to administer capital punishment. *See, e.g.*, *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019); *Glossip v. Gross*, 576 U.S. 863, 869 (2015); *Baze v. Rees*, 553 U.S. 35, 47 (2008) (plurality op.). Although constitutionally permitted, the State's power to administer capital punishment is not plenary. Rather, the State's authority is limited by the Eighth Amendment, which forbids methods of execution that are "cruel and unusual." U.S. CONST. amend. VIII. Frazier does not challenge the State's right to effectuate his execution; instead, he contends that the State's chosen *method* of execution violates his Eighth Amendment right to be free from cruel and unusual punishment. (*See, e.g.*, doc. 1 at 16–19). The State seeks to execute Frazier pursuant to the ADOC's nitrogen hypoxia protocol—the same protocol used to execute Smith, Miller, and Grayson in 2024. *See supra* Part III.B. Frazier argues that the Protocol violates the Eighth Amendment "because it creates an unnecessary risk of superadded pain" by depriving an inmate of oxygen while he is still conscious. (Doc. 22 at 8).

The Eighth Amendment does not guarantee Frazier a painless death. *See Bucklew*, 587 U.S. at 132. Instead, the relevant Eighth Amendment inquiry is whether the State's chosen method of execution "'superadds' pain well beyond what's needed to effectuate a death sentence." *Id.* at 136–37. Frazier's method of execution claim "faces an exceedingly

high bar." *See Barr v. Lee*, 591 U.S. 979, 980 (2020) (per curiam); *see also Price*, 920 F.3d at 1326 (explaining that "[d]eath-row inmates face a heavy burden" when bringing an Eighth Amendment method of execution challenge). Frazier's claim cannot succeed unless he establishes that the Protocol "presents a risk that is *sure or very likely* to cause serious illness and needless suffering" and also "gives rise to sufficiently *imminent* dangers." *Grayson*, 121 F.4th at 897 (emphases in original) (quoting *Price*, 920 F.3d at 1325). The Protocol must pose a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 50). To date, the United States Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Bucklew*, 587 U.S. at 133.

To determine whether the State's "method of execution cruelly superadds pain to the death sentence," thus violating the Eighth Amendment, Frazier must also show a "feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain." *See id.* at 134; *see also Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 858 (11th Cir. 2017) (explaining that a plaintiff asserting an Eighth Amendment method of execution challenge "must plausibly plead, and ultimately prove, that there is an alternative method of execution that is feasible, readily implemented, and in fact significantly reduces the substantial risk of pain posed by the state's planned method of execution"). Further, he must show that the State "has refused to adopt [his

alternative method of execution] without a legitimate penological reason." *See Bucklew*, 587 U.S. at 134.[17]

Frazier cannot show a substantial likelihood of success on the merits of his Eighth Amendment claim for at least three reasons: (1) he fails to show that the Protocol is sure or very likely to cause severe psychological pain; (2) he has not marshalled sufficient evidence that his alternative would significantly reduce a substantial risk of severe pain; and (3) he fails to show that the State refuses to adopt his alternative without a legitimate penological reason. The Court addresses each issue in turn below.

### 1. The Risk of Pain Created by the Protocol

The ADOC's nitrogen hypoxia protocol consists of three major steps. First, the execution team escorts the condemned inmate to the execution chamber and places him on the gurney, at which time the execution team secures a pulse oximeter to his person. (Doc. 22-5 at 17). Second, the execution team places and adjusts the mask on the condemned inmate's face. (*Id.* at 18). Third, after a series of safety checks, the reading of the execution warrant, and any final statement by the condemned inmate, the Warden activates the nitrogen hypoxia system. (*Id.*). Pure nitrogen gas is introduced into the mask and administered for "fifteen minutes or five minutes following a flatline indication on the EKG, whichever is longer." (*Id.* at 19).

---

[17] At the evidentiary hearing, the State appeared to back away from its position that Frazier's proposal was not feasible or readily implemented. Instead, the State argued that the Protocol does not create a substantial risk of severe pain, that Frazier's proposal would not significantly reduce a substantial risk of severe pain, and that the State has legitimate penological reasons not to adopt it. Consequently, the Court will focus its analysis on those prongs.

Frazier contends that the Protocol does not work as intended and "necessarily causes conscious suffocation, in violation of the Eighth Amendment." (Doc. 22 at 2). According to Frazier, the Protocol "creates a risk of superadded pain" because it requires him to "breathe-in the manner of death" and deprives him of oxygen while he is still conscious, which he calls "conscious suffocation."[18] (Doc. 22 at 9; doc. 22-7 at 4, para. 7). Frazier does not argue that the Protocol creates a risk of physical pain. Therefore, the question before the Court is whether the Protocol creates constitutionally unacceptable risks of psychological pain.

"[A] substantial risk of conscious suffocation *can* create an Eighth Amendment problem regardless of the method of execution being used." *Grayson*, 121 F.4th at 898 (emphasis added). Even without a showing of physical pain, Frazier may prevail if the Protocol "induces psychological terror or pain that is severe enough to support an Eighth Amendment claim." *Id.* at 900 n.3. On this record, however, Frazier fails to meet his burden to establish that the Protocol *does* create a substantial risk of serious psychological pain such that the Protocol violates the Eighth Amendment. As explained below, Frazier does not establish that the Protocol presents a risk that is sure or very likely to cause needless psychological suffering.

---

[18] In his declaration, Dr. Antognini defined suffocation as the "depriv[ation] of oxygen." (Doc. 31-1 at 27, para. 53). At the evidentiary hearing, Dr. Antognini contrasted two methods of suffocation: (1) holding a pillow over one's head, which leads to a buildup of carbon dioxide and a sensation of breathlessness and (2) breathing in an inert gas—like nitrogen. Dr. Antognini testified that because the deprivation of oxygen by inert gas preserves the ability to take normal breaths, this method prevents the sensation of breathlessness. Therefore, despite the imprecise use of the term "conscious suffocation," the evidence presented suggests Frazier will be able to breathe freely and will not experience symptoms akin to the breathlessness associated with smothering.

At the time of the Eighth Amendment's adoption, the Founders understood "cruel" to include punishments "[d]isposed to give pain to others, in body or *mind*." *Bucklew*, 587 U.S. at 130 (alteration in original) (emphasis added) (quoting 1 N. Webster, An American Dictionary of the English Language (1828)).  However, the Eighth Amendment "does not demand the avoidance of all risk of pain in carrying out executions." *Id.* at 134 (quoting *Baze*, 553 U.S. at 47).  Thus, Frazier is not guaranteed a painless death, in body or mind. *See id.* at 133.  Consequently, the Protocol cannot be considered cruel and unusual simply because Frazier may experience psychological pain "either by accident or as an *inescapable* consequence of death." *See Baze*, 553 U.S. at 50 (emphasis added).

A state's administration of capital punishment, which remains constitutional subject to the Eighth Amendment's protections, presumes the prospect of some pain.  Indeed, "[p]sychological pain or mental suffering is a likely result of being sentenced to death and anticipating the execution." *In re Ohio Execution Protocol Litig.*, 881 F.3d 447, 450 (6th Cir. 2018) (citation omitted); (*see also* doc. 22-7 at 4, para. 7) (Dr. McAlary agreeing that "[s]ome level of psychological pain is inherent in the [execution] process").  This psychological pain likely grows as execution day draws near—an unfortunate but "inescapable consequence of death." *Baze*, 553 U.S. at 50.  The relevant question for the Court is whether the Protocol very likely causes "*needless* suffering," *Grayson*, 121 F.4th at 897 (emphasis added); "cruelly *superadds* pain to the death sentence," *Bucklew*, 587 U.S. at 134 (emphasis added); or creates a "'substantial risk of *serious* harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they

were 'subjectively blameless for purposes of the Eighth Amendment,'" *Glossip*, 576 U.S. at 877 (emphasis added) (citing *Baze*, 553 U.S. at 50).

As discussed further below, Frazier has not established that the Protocol very likely causes needless psychological suffering, superadds psychological pain, or creates a substantial risk of serious psychological harm. The Court credits Dr. Antognini's opinion that inhaling nitrogen pursuant to the Protocol does not create an unreasonable risk of pain because the oxygen deprivation resulting from inhaling nitrogen materially differs from the oxygen deprivation occasioned by other forms of suffocation, such as smothering with a pillow. Additionally, Frazier's lay witnesses' accounts of previous nitrogen hypoxia executions are undermined by Dr. Antognini's expert opinion, to which the Court affords great weight, and by the lack of evidence about when nitrogen gas begins flowing into the mask. Moreover, the Court credits Dr. Antognini's expert opinions over the expert opinions Dr. McAlary offered in Grayson's litigation because Dr. McAlary's opinions were not sufficiently supported by research, scientific studies, or articles.

It is undisputed that, under the Protocol, Frazier will be deprived of oxygen while conscious after the nitrogen gas is introduced. But according to Dr. Antognini, Frazier will not experience the same "pain and suffering as might occur with other types of suffocation, such as smothering and choking" because the Protocol "does not prevent [Frazier] from taking normal breaths and exhaling carbon dioxide." (Doc. 31-1 at 27, para. 53). Frazier's evidentiary submissions do not refute or undermine Dr. Antognini's conclusion on this point.

The parties disagree regarding how quickly an inmate will become unconscious following the introduction of nitrogen gas. Dr. Antognini opines that an inmate will lose consciousness "within 30-40 seconds after the inspired nitrogen is >90% and the inmate is inhaling, i.e., there is no breath holding." (*Id.* at 7, para. 9). Frazier disagrees, arguing that the Protocol "does not work the way Defendants claim" and contending that the State's three previous executions under the Protocol disprove Dr. Antognini's thirty-to-forty second timeframe. (*See generally* doc. 22 at 2, 4–6). Among other evidence, Frazier relies on witnesses' reports that Smith, Miller, and Grayson moved their respective heads, arms, and legs for minutes after the nitrogen began flowing; according to Frazier, these movements are evidence that the inmates remained conscious after the nitrogen began flowing and were distressed and in pain. Frazier's claims are undermined, however, because the record does not establish when nitrogen begins to flow into the mask, and because Dr. Antognini opines that unconscious individuals commonly experience involuntary movements.

First, the record does not establish when nitrogen begins to flow under the Protocol. After the inmate has an opportunity to make a final statement, the Warden activates the nitrogen hypoxia system, which introduces the flow of pure nitrogen gas into the mask on the inmate's face. (Doc. 22-5 at 18). At the evidentiary hearing, Commissioner Hamm testified without contradiction that time passes between when the Warden exits the execution chamber and when the nitrogen begins to flow, although Commissioner Hamm did not quantify the amount of time. Commissioner Hamm's testimony thus informs the Court's assessment of the witness accounts of the previous nitrogen hypoxia executions.

One media witness to Grayson's execution described the moment "nitrogen began flowing" as follows: "Grayson tightly clenched his hands, took deep gasps, shook his head vigorously[,] and pulled against his restraints. He appeared to lose consciousness . . . about six minutes" after the introduction of the nitrogen gas. (Doc. 22 at 6). Dr. McAlary also witnessed Grayson's execution and testified as a lay witness regarding his observations. Dr. McAlary testified that upon the introduction of nitrogen gas, Grayson appeared distressed and agitated; and that he observed Grayson moving his head, arms, and legs for minutes after the nitrogen gas began flowing. These witnesses' accounts are insufficiently reliable[19] because they do not know when the nitrogen began to flow, and thus the witnesses "cannot reliably pinpoint when an inmate loses consciousness." (Doc. 31 at 17). Therefore, their accounts fail to contradict or undermine Dr. Antongini's proffered timeframe.[20] Faced with competing accounts, the Court assigns greater weight to Dr. Antognini's expert opinion that an inmate loses consciousness closer to thirty to forty seconds after nitrogen gas is introduced.

---

[19] The Court does not suggest that these witnesses are not credible; the Court has no reason to doubt that they saw what they claim to have seen. Rather, the Court finds their testimony to be unreliable evidence of when the inmates lost consciousness and whether the inmates were conscious when they moved.

[20] Additionally, the State presents credible evidence that Smith held his breath during his execution, thereby prolonging it. The State contends that "Smith held his breath, delaying the time to unconsciousness" (doc. 31 at 17), and that once Smith took a "deep inhale and exhale . . . he lost consciousness shortly thereafter" (doc. 42 at 65, para. 5). Captain McKenzie testified in his affidavit that Smith's oxygen levels suddenly dropped to around 40% from 97–98%. (*Id.*). Further, Dr. Antognini opined in his declaration that Captain McKenzie's observations would be consistent with Smith holding his breath. (Doc. 31-1 at 20, para. 31). Additionally, Dr. Phillip Nitschke, Smith's medical expert, wrote following Smith's execution that "breath-holding would have increased the level of carbon dioxide in [Smith's] body, acidifying his blood and increasing discomfort and distress." (*Id.*). The State's evidence further supports a finding that Dr. Antognini's timeframe is sound, and also undermines Frazier's contention that the *Protocol* caused Smith to experience a prolonged or unnecessarily painful death.

Second, and relatedly, Dr. Antognini's expert opinion that unconscious individuals experience involuntary movements undermines the purported significance of Smith's, Miller's, and Grayson's movements during their respective executions. In his declaration, Dr. Antognini opines that "[v]arious reports in both humans and animals describe muscular movements, including muscle tremors and convulsion-like activity, after initiation of hypoxia." (Doc. 31-1 at 11, para. 15). Additionally, at the evidentiary hearing, Dr. Antognini testified that he was not surprised to learn that Grayson moved during his execution because movements, including breaths and even convulsions, after the introduction of an inert gas—when a person is unconscious and unable to feel pain—are not uncommon. (*E.g.*, doc. 45 at 35:21–25, 36:1–8). In support of his opinions, Dr. Antognini relies upon multiple scientific studies and articles. The Court credits Dr. Antognini's opinions and affords them great weight. Consequently, the evidence of Smith's, Miller's, and Grayson's movements during their respective executions does not support a finding that any of them experienced severe psychological pain or distress over and above what is inherent in any execution. *Cf. Baze*, 553 U.S. at 57 (concluding that Kentucky's decision to include pancuronium bromide in its three-drug lethal injection protocol did not violate the Eighth Amendment because Kentucky had "an interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as signs of consciousness or distress").

On this record, Frazier has not established that the Protocol very likely causes needless psychological suffering, superadds psychological pain, or creates a substantial risk of serious psychological harm. While the Court does not doubt that Frazier likely will

experience some psychological pain before and during his execution, the Court finds that Frazier has failed to meet his burden to show that the Protocol creates a substantial risk of serious psychological harm over and above what is inherent in any execution. Consequently, Frazier fails to establish a substantial likelihood of success on the merits of his Eighth Amendment claim.

### 2. Significant Reduction of Substantial Risk of Severe Pain

Frazier also has not established a substantial likelihood of success on the merits because he fails to show that his proposed alternative method of execution would "significantly reduce a substantial risk of severe pain." *See Bucklew*, 587 U.S. at 143. Frazier's proposed alternative is a modified version of the ADOC's current nitrogen hypoxia protocol. This alternative begins with Frazier receiving "an intravenous injection of 500 mg of midazolam." (Doc. 1 at 14, para. 103). Next, the proposal requires a consciousness check five minutes after the midazolam injection, consistent with the provisions of the State's lethal injection protocol. (*Id.* at 14, paras. 104–05). Once Frazier is deemed "unconscious," the execution team would proceed pursuant to the State's nitrogen hypoxia protocol by placing the mask over Frazier's face and then introducing nitrogen gas into the mask. (*Id.* at 14–15, paras. 106–07; *see* doc. 22-5 at 8–9).

As discussed above, Frazier argues that the Protocol "creates a risk of superadded pain" violative of the Eighth Amendment because he will be deprived of oxygen while conscious. (Doc. 22 at 9). Again, the pain to which he refers is psychological rather than physical. Dr. McAlary opines that the Protocol "raises the risks of significant psychological pain" because it does not provide for "any form of sedation." (Doc. 22-7 at

4, para. 7).  Dr. McAlary further opines that because the Protocol requires Frazier "to breathe-in the manner of death," "[s]edation would alleviate that natural level of panic and decrease the likelihood of that increased psychological pain and suffering" that Frazier is likely to endure. (*Id.*).  At the evidentiary hearing, the State represented that the Protocol does not prevent Frazier from requesting and, assuming a medical need, obtaining a medical prescription for a sedative.

"The Eighth Amendment does not come into play unless the risk of pain associated with the State's method [of execution] is 'substantial when compared to a known and available alternative.'" *Bucklew*, 587 U.S. at 134 (quoting *Glossip*, 576 U.S. at 878).  Thus, Frazier must show that his proposed alternative would "in fact significantly reduce[] a substantial risk of severe pain." *See id.* at 127 (quoting *Glossip*, 576 U.S. at 877). Distinguishing between "constitutionally permissible and impermissible degrees of pain . . . is a *necessarily* comparative exercise." *Id.* at 136 (emphasis in original).  Thus, the Court will compare the Protocol with Frazier's proposed alternative to determine whether the alternative would significantly reduce a substantial risk of severe pain. *See id.* "A minor reduction in risk is insufficient; the difference must be clear and considerable." *Id.* at 143.

The psychological pain that Frazier's midazolam alternative would purportedly alleviate is that which he would experience from the time when he begins inhaling nitrogen until he loses consciousness.  According to Dr. Antognini, whose opinion the Court credits, the period between the nitrogen's activation and loss of consciousness is likely less than a minute. (*See* doc. 31-1 at 7, para. 9) ("[T]he inmate will quickly become

unconscious . . . within 30-40 seconds."). Frazier contends that the time between nitrogen inhalation and unconsciousness, however long, increases psychological terror or pain in an amount sufficient to violate the Eighth Amendment. Citing Dr. McAlary's opinion, Frazier further contends that midazolam would mitigate this psychological pain by rendering him unconscious before he begins inhaling nitrogen and thus "breath[ing] in the manner of death." (*See* doc. 22-7 at 4, para. 7). But every method of execution involves a period during which the inmate experiences psychological pain because he realizes death is imminent. Under his proposed alternative, Frazier would still be aware that he is about to experience his last few minutes of consciousness, and thus he would still experience the psychological pain inherent in any execution. The difference under Frazier's proposal is that he would experience this psychological pain earlier: before the midazolam is administered, rather than before he begins inhaling nitrogen.

Frazier's submissions are insufficient to support a finding that rendering him unconscious sooner through sedation will *significantly* reduce a *substantial* risk of *severe* psychological pain. Dr. McAlary's opinion, for which he did not provide a study or similar support, that administering midazolam before Frazier inhales nitrogen gas would alleviate Frazier's psychological pain and suffering is insufficient to establish that Frazier's alternative would result in a "clear and considerable" reduction in risk. *See Bucklew*, 587 U.S. at 143. Again, Frazier fails to establish that the psychological pain he may experience is different in kind or degree from that inherent in the execution process. "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish

life humanely." *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947). Adopting Frazier's proposed alternative would amount to this Court imposing "best practices" for his execution, which the Constitution does not require. *See Bucklew*, 587 U.S. at 134 (quoting *Baze*, 553 U.S. at 51 & nn.2–3). And as indicated above, Frazier may request and, assuming a medical need, obtain a prescription for a sedative independent of the Protocol. Thus, Frazier has not established a substantial likelihood of success on the merits of his Eighth Amendment claim for this additional reason.

### 3. Legitimate Penological Reason

Frazier fails to establish a substantial likelihood of success on the merits for yet another reason:  he cannot show that the State lacks a legitimate penological reason for refusing to adopt his pre-nitrogen sedation alternative. The Constitution "affords a 'measure of deference to a State's choice of execution procedures' and does not authorize courts to serve as 'boards of inquiry charged with determining "best practices" for executions.'" *Id.* (quoting *Baze*, 553 U.S. at 51 & nn.2–3). The State has proffered legitimate reasons for declining to adopt a hybrid lethal injection/nitrogen hypoxia protocol involving an intravenous injection of midazolam followed by the introduction of nitrogen gas. First, Frazier's proposed method of execution has "never been used . . . and ha[s] 'no track record of successful use.'" *See id.* at 142 (quoting *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017)). The Eighth Amendment does not require the State to approve and adopt an "untried and untested" method of execution. *Id.* (citing *Baze*, 553 U.S. at 41). The State has a legitimate penological reason to decline to adopt Frazier's novel method involving aspects of both lethal injection and nitrogen hypoxia protocols and which has an

insufficient (indeed, nonexistent) track record of successful use. *See id.* (explaining that a state has a valid penological reason "not to be the first to experiment with a new method of execution").

Additionally, because capital punishment is constitutional, it follows "that there must be a means of carrying it out," subject to the protections afforded by the Eighth Amendment. *Baze*, 553 U.S. at 47. The Supreme Court has observed that death penalty opponents have successfully pressured "pharmaceutical companies to refuse to supply the drugs used to carry out death sentences." *Glossip*, 576 U.S. at 870. Here, the State explains that in response to these developments, it turned to nitrogen hypoxia in part to "implement[] a method that does not depend so heavily on external variables." (Doc. 31 at 23). Indeed, the Eleventh Circuit noted that "[n]o supply concerns exist for nitrogen," *Price*, 920 F.3d at 1327, unlike certain controlled substances featured in lethal injection protocols across the United States. *Cf. Glossip*, 576 U.S. at 870 (explaining that the "sole American manufacturer of sodium thiopental, the first drug used in the standard three-drug protocol . . . exit[ed] the sodium thiopental market entirely").

If history is any guide, the fraught relationship between death penalty opponents and states that administer capital punishment will continue regardless of the chosen method of execution. Despite fierce advocacy on both sides of the debate, the State remains entitled to administer capital punishment and therefore has valid penological reasons to attempt to safeguard its chosen methods of execution from outside influence. While the State's adoption of nitrogen hypoxia by no means guarantees that its chosen methods will be free from outside influence or dampen the zeal of death penalty opponents, the State's effort to

mitigate these concerns remains a legitimate penological goal. Thus, the State's explanation suffices as another valid penological reason to decline to adopt Frazier's proposed alternative method.

In sum, Frazier has not shown a substantial likelihood of success on the merits because he fails to show that the Protocol is sure or very likely to cause severe psychological pain, or that his proposed alternative execution method "would significantly reduce a substantial risk of severe pain." *See Bucklew*, 587 U.S. at 134. Additionally, he fails to show that the State "has refused to adopt" his alternative "without a legitimate penological reason." *See id.* Consequently, he has not established entitlement to a preliminary injunction for this reason alone. *See Grayson*, 121 F.4th at 896.

The Court does not suggest that depriving an inmate of oxygen while conscious could never constitute an Eighth Amendment violation. Notwithstanding the State's stubborn refusal at the evidentiary hearing to concede this point, the longer an inmate remains conscious while breathing in nitrogen during an execution, the more likely it becomes that the Eighth Amendment may be violated. But the Court need not, and does not, decide at what point the conscious deprivation of oxygen would raise a constitutional concern. On this record, Frazier has not cleared the "exceedingly high bar" to show a substantial likelihood of success on his Eighth Amendment claim. *See Barr*, 591 U.S. at 980.

## B. The Equities and Frazier's Delay

Even if Frazier had shown a substantial likelihood of success on the merits—which he did not—he is still not entitled to a preliminary injunction because the equities are not

in his favor.  A preliminary injunction is an "extraordinary and drastic remedy." *Siegel*, 234 F.3d at 1176 (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).  It is an equitable remedy which "is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).  This Court must "apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Id.* (citation omitted); *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020) (citation omitted); *Jones v. Allen*, 485 F.3d 635, 638 (11th Cir. 2007) (citation omitted).[21]  "Last-minute stays should be the extreme exception, not the norm, and 'the last-minute nature of an application' that 'could have been brought' earlier, or 'an applicant's attempt at manipulation,' 'may be grounds for denial of a stay.'" *Bucklew*, 587 U.S. at 150 (quoting *Hill*, 547 U.S. at 584).  District courts "'can and should' protect settled state judgments from 'undue interference' by invoking their 'equitable powers' to dismiss or curtail suits that are pursued in a 'dilatory' fashion or based on 'speculative' theories." *Id.* at 151 (quoting *Hill*, 547 U.S. at 584–85).

First, the equities are not in Frazier's favor because he unreasonably delayed filing this § 1983 action and seeking injunctive relief.  Frazier's Eighth Amendment claim is that the ADOC's nitrogen hypoxia protocol—released in late August 2023—is

---

[21] Although Frazier frames his motion (doc. 22) as a request for a preliminary injunction and not a stay of execution, the Court finds that based on the alternative relief he seeks—an injunction preventing the State from executing him until this litigation is decided on the merits—he is effectively requesting a stay of execution in the alternative.  In any event, the Court's analysis applies equally to the extent he requests a preliminary injunction, a stay of execution, or both.

unconstitutional. (*See generally* doc. 1).  Frazier mentions the Protocol and its alleged shortcomings numerous times in the complaint (*e.g.*, doc. 1 at 3, paras. 15–17; *id.* at 11–12, para. 87; *id.* at 12, para. 89), including his prayer for relief wherein he asks the Court to "[i]ssue an order declaring the Protocol unconstitutional and enjoining Defendants Hamm and Raybon from executing Mr. Frazier using the Protocol" (*id.* at 21).  His motion for a preliminary injunction confirms his position that "the Protocol violates the Eighth Amendment because it creates a risk of superadded pain" (doc. 22 at 9), as further shown through his reliance on Dr. McAlary's opinion that the Protocol creates certain risks (*id.* at 10; doc. 22-7), and his argument that he will be irreparably harmed "if his execution under the Protocol is not enjoined" (doc. 22 at 10).  Yet he waited over a year to file this lawsuit and more than sixteen months to request a preliminary injunction.

Frazier also argues that the State's nitrogen hypoxia executions in 2024 prove that the Protocol does not work as the State has suggested, and that during those executions, the inmates experienced pain and distress as evidenced by their movements for several minutes. (Doc. 22 at 2, 4–6).  But Frazier did not file this lawsuit until nearly ten months after Smith's execution and nearly two months after Miller's execution—and he waited even longer to seek injunctive relief.[22]

Frazier's postconviction litigation timeline reflects that he filed this action over one year after the Protocol was publicly released, and he filed his request for a preliminary injunction (1) over sixteen months after the Protocol was released; (2) almost a year after

---

[22] Grayson was executed on November 21, 2024, less than a week after Frazier filed this action.

Smith's execution; (3) almost four months after Miller's execution; (4) about three months after the State moved the Alabama Supreme Court to set his execution date; (5) two months after he filed this lawsuit; (6) one month after the Alabama Supreme Court granted the State's motion to set his execution date; and (7) fewer than four weeks before the beginning of his February 6, 2025 execution timeframe.[23]   And Frazier filed his motion for preliminary injunction only after this Court prompted him to do so. (Doc. 19).

The Court concludes that Frazier's delay in filing suit and, to a greater extent, seeking a preliminary injunction was "unreasonable, unnecessary, and inexcusable." *See Brooks v. Warden*, 810 F.3d 812, 824 (11th Cir. 2016) (citation omitted).  As indicated above, Frazier's lawsuit challenges the constitutionality of the Protocol, which was released in August 2023.  Yet Frazier waited over a year to file this action and over sixteen months to seek injunctive relief—even though he has identified no impediment preventing him from seeking relief in the last year.  Even after the State moved to set his execution date on October 18, 2024, Frazier waited nearly a month to file his § 1983 action—and still did not request emergency injunctive relief, even though such a request is inevitable in § 1983 cases with an imminent execution date.  Instead, Frazier continued to sit on his hands and not seek injunctive relief for over seven weeks.  Then, on January 7, 2025, Governor Ivey set his execution timeframe, and the same day, this Court ordered Frazier to file any motion for preliminary injunction by noon on January 15, 2025 (*see* doc. 19).

---

[23] The Court does not suggest that Frazier would have been justified in waiting to file his lawsuit or motion for preliminary injunction until the State moved to set his execution date, until the Alabama Supreme Court granted the motion, or until the Governor set his execution timeframe.  The Court mentions these events to underscore the unreasonable nature of Frazier's delay in waiting to file both this lawsuit and his request for injunctive relief.

The Court is left to speculate how much longer Frazier would have waited had this Court not set a deadline.

Frazier offers no reasonable explanation, either in his motion or at the hearing, for why he could not have filed this case or sought injunctive relief earlier. In his motion, Frazier downplays the delay, calling it "minimal" and claiming it will not prejudice the State. (Doc. 22 at 12). He claims that he filed this lawsuit in November 2024 after obtaining information from witnesses to the previous nitrogen hypoxia executions and "investigating." (*Id.* at 13). But again, his lawsuit focuses on the alleged unconstitutionality of the Protocol, which became publicly available in August 2023, and he has not identified any fact or circumstance which prohibited him from filing this action in the last year. While the State's 2024 nitrogen hypoxia executions may have elucidated facts which may further support Frazier's constitutional claims, it is the *Protocol* he challenges and which gives rise to his claims here. The other executions do not change the reality that the Protocol has been publicly available since August 2023. Frazier's explanation does not justify his waiting to sue until over a year after the Protocol's release. *Cf. Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1296–97 (11th Cir. 2016) (finding that the equities disfavored a stay of execution because of the plaintiff's delay and making a comparable observation about the plaintiff's delay in challenging a Georgia statute). It certainly does not explain his failure to immediately seek injunctive relief when he did file this lawsuit, or why he waited nearly two months to do so—and only after this Court gave him a deadline to act. And Grayson, who also was represented by Frazier's counsel, filed a similar lawsuit challenging the Protocol in June 2024. (*See* doc. 1 in *Grayson v. Hamm et al.*, Case No.

2:24-cv-376-RAH (M.D. Ala. June 28, 2024)).[24]  While not dispositive, the fact that Grayson filed his own similar action nearly five months before Frazier underscores Frazier's unreasonable delay in filing this lawsuit and seeking injunctive relief. *Cf. Jones*, 811 F.3d at 1297 (observing that another death row inmate filed a similar legal challenge as the plaintiff much earlier).

At the evidentiary hearing, Frazier offered other reasons why his delay was not unreasonable, but none is persuasive.  He argued that he was waiting for other nitrogen hypoxia executions to occur to see how the Protocol operates in practice.  Assuming this explanation is reasonable, it does not justify Frazier's waiting to act until nearly ten months after Smith's execution and two months after Miller's execution, nor does it justify his additional delay in seeking injunctive relief.  And as noted above, Grayson filed a very similar lawsuit almost five months earlier, which suggests Frazier too could have filed this lawsuit sooner.  Frazier also asserted that an inmate may be hesitant to challenge an

Frazier also lays the blame at the State's feet, claiming that "virtually all" of the delay is "attributable to [the State's] lack of transparency." (Doc. 22 at 12–13).  But Frazier does not explain how this alleged lack of transparency contributed to the delay or what additional information he needed which would have allowed him to bring this lawsuit earlier.  Moreover, to the extent Frazier needed or desired additional information, a reasonably diligent plaintiff would have sued earlier and sought expedited discovery.  Indeed, Frazier did not request any discovery when he filed this action or since.

---

[24] The Court expresses no view as to whether Grayson unreasonably delayed filing his lawsuit.

execution protocol out of fear that the challenge will draw the State's attention and result in his execution date being set sooner. Notably, however, Frazier did not assert that *he* had this fear. And as the State points out, Frazier previously litigated a challenge to the State's lethal injection protocol for years. Finally, when asked why Frazier did not request a preliminary injunction earlier, his counsel candidly admitted that there was no explanation.

The equities are also not in Frazier's favor because he takes a position in this lawsuit that contradicts his position in earlier litigation.[25] During the earlier *Lethal Injection Protocol Litigation*, Frazier identified "asphyxiation via the inhalation of pure nitrogen gas" as an alternative execution method, claiming that this method would render "the condemned inmate unconscious within seconds and painlessly dead within minutes." (Doc. 348 at 32–33, paras. 161, 163 in *Lethal Injection Protocol Litigation*). Frazier elected nitrogen hypoxia as his method of execution in 2018. In part, Frazier now challenges the Protocol as unconstitutional because it deprives a conscious person of oxygen, which he alleges creates a "constitutionally unacceptable risk of suffocation." (Doc. 1 at 12, para. 88) (quoting *Baze*, 553 U.S. at 53). But Frazier's proposed nitrogen gas inhalation method in the *Lethal Injection Protocol Litigation* contemplated that the condemned inmate would be conscious when the nitrogen gas was delivered, and thus his own proposal involved depriving a conscious person of oxygen. That Frazier now challenges the Protocol because it deprives a conscious person of oxygen strikes the Court as a change in legal position

---

[25] The State argues that Frazier is estopped from advancing his current position. Although the Court is not persuaded that estoppel applies here, Frazier's change in position underscores that the equities are not in his favor.

intended to adapt to the "exigencies of the moment," rather than a bona fide legal argument that depriving a conscious person of oxygen is constitutionally suspect. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993) (per curiam)).[26]   While Frazier may not be estopped from advancing his current position, his change in position, although not dispositive, bolsters the Court's conclusion that the equities do not favor injunctive relief on this record.

In sum, Frazier has failed to identify any impediment to filing this action and seeking injunctive relief anytime within the last year after the Protocol was released; or three months ago, after the State moved to set his execution date.  Frazier's delay in seeking injunctive relief until twenty-two days before his scheduled execution is all the more inexplicable given the repeated admonitions from the Supreme Court and the Eleventh Circuit to "apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *E.g.*, *Hill*, 547 U.S. at 584 (citation omitted).  Based on the totality of the circumstances, the Court finds Frazier's delays inexplicable and inexcusable, and he has thus left "little doubt that the real purpose behind his claim is to seek a delay of his execution, not merely to effect an alteration of the manner in which it is carried out." *See Allen*, 485 F.3d at 640 (citation omitted).

---

[26] The Court acknowledges that in the *Lethal Injection Protocol Litigation*, Frazier requested that an anxiolytic such as midazolam be administered before the nitrogen gas is introduced.  Notwithstanding this request, Frazier's proposal still contemplated that the inmate would be conscious when the nitrogen gas was introduced.

In a recent opinion, this Court implored members of the bar to cease the all too common "practice of filing lawsuits and requests for stay of execution at the last minute where the facts were known well in advance." *Mills v. Hamm*, 734 F. Supp. 3d 1226, 1248 (M.D. Ala. 2024).  The Court once again implores attorneys representing death-sentenced inmates to stop this practice because it is ineffective and unworkable.  In *Mills*, the Court explained that "[t]he unique circumstances of execution litigation and the attendant deadlines are precisely why such litigation should be filed at the earliest possible opportunity:  to ensure that courts at all levels have as much time as possible to review the case and make a reasoned decision." *Id.*  Like *Mills* and other cases, this case "seems to follow a continuing trend of lawyers filing last-minute § 1983 lawsuits to create an emergency situation in the hopes that the condensed timeframe will persuade courts to stay the execution to afford themselves more time to consider the matter." *See id.*  The Court further explained why this practice is ineffective and unworkable:

> [T]his strategy is untenable given the Supreme Court's instruction that "[c]ourts should police carefully against attempts to use [execution] challenges as tools to interpose unjustified delay." *Bucklew*, 587 U.S. at 150.  And again, sufficient time to consider the issues is essential given the nature of execution litigation.  The Court acknowledges that lawyers representing death row inmates set to be executed unquestionably owe a duty to their clients.  However, these lawyers are also officers of the court.  The act of filing a civil action and then a request for injunctive relief after unjustified delay often appears to be legal manipulation rather than genuine legal advocacy.

*Id.* (second and third alterations in original).

40

As the Court observed in *Mills*, certain situations may justify an inmate's late filing of a § 1983 action challenging execution procedures. *Id.*; *see, e.g.*, *Ramirez v. Collier*, 595 U.S. 411, 434–35 (2022) (rejecting the argument that a condemned inmate inequitably delayed litigation "by filing suit just four weeks before his scheduled execution" because the inmate "had sought to vindicate his rights for months" via the prison's internal grievance system). This case, however, does not present circumstances sufficient to justify the significant delay in seeking relief. "While each death case is very important and deserves [the Court's] most careful consideration," the fact that Frazier filed suit and sought a preliminary injunction or stay so late in the day, "and without adequate explanation," supports a finding that the equities do not weigh in his favor. *See Jones*, 811 F.3d at 1297–98.

"Equity also weighs against granting the [preliminary injunction or] stay because 'the State and the victims of crime have an important interest in the timely enforcement of a sentence.'" *See Woods*, 951 F.3d at 1293 (quoting *Hill*, 547 U.S. at 584). Frazier was convicted and sentenced to death in 1996 for Pauline Brown's murder. The State and Brown's family have a strong interest in seeing Frazier's punishment exacted. *See Brooks*, 810 F.3d at 825; *Allen*, 485 F.3d at 641. Indeed, they have already waited almost thirty years. Because Frazier inexcusably delayed bringing this action, and because the State and the victim's family have a strong interest in the timely enforcement of his sentence, Frazier has failed to show that equity favors entry of a preliminary injunction, and his motion is due to be denied for this additional, independent reason.

## VI.  CONCLUSION

Because Frazier has not shown a substantial likelihood of success on the merits, and because the equities weigh against him, Frazier has not established entitlement to the extraordinary remedy of a preliminary injunction.

Accordingly, it is

ORDERED that Frazier's motion for preliminary injunction (doc. 22) is DENIED.

DONE this 31st day of January, 2025.

　　　　　　　/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE